[Cite as *In re A.E.*, 2014-Ohio-4540.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

IN RE:

    A.E.,

DEPENDENT CHILD.

[TONYA CURRIER - APPELLANT].

CASE NO. 13-14-14

O P I N I O N

IN RE:

    J.E.,

DEPENDENT CHILD.

[TONYA CURRIER - APPELLANT].

CASE NO. 13-14-15

O P I N I O N

**Appeals from Seneca County Common Pleas Court
Juvenile Division
Trial Court Nos. 21250003 and 21250004**

**Judgments Affirmed**

**Date of Decision:   October 14, 2014**

APPEARANCES:

    *Lisa A. Miller* for Appellant

    *Tiffany F. Hoyt*  for Appellee, Seneca County DJFS

**WILLAMOWSKI, P.J.**

{¶1} Respondent-appellant Tonya Currier ("Currier") brings this appeal from the judgment of the Court of Common Pleas of Seneca County, Juvenile Division, terminating her parental rights and granting custody of the children to the Seneca County Department of Job and Family Services ("the Agency"). For the reasons set forth below, the judgment is affirmed.

{¶2} In November 2006, A.E. was born to Currier and Jonathan Eastman ("Eastman"). R. 1.[1] J.E. was born to Currier and Eastman in January 2008. R. 1. On August 9, 2009, the Agency filed complaints alleging that A.E. and J.E. were neglected and dependent. Tr. 106-107. The trial court adjudicated the children as dependent on September 4, 2009. The case was closed in 2010 after significant progress was made on the case plan and the children were returned to their parents. Tr. 112.

{¶3} A second complaint alleging that A.E. and J.E. were neglected and dependent was filed on February 7, 2012. R. 1. The basis for the complaint was that Currier had attempted to commit suicide by cutting her wrists when her children were present. An ex parte order was issued placing the children in the temporary custody of Eastman. R. 3. On May 2, 2012, Dawn DeRan ("GAL"),

---

[1] There are two different records before this court, the record for trial court case number 2125003 and concerning A.E. and the record for trial court case number 21250004 and concerning J.E. The docket sheets indicate that the filings in each case appear to be identical. Thus, both records will be referenced as "R" and the docket number. The hearings were combined, so the transcripts will be identified independent of the case numbers.

the guardian ad litem for the children filed her written report recommending that A.E. and J.E. remain in the custody of Eastman. R. 26. An adjudication hearing was held on May 8 and June 4, 2012 R. 32. The magistrate determined that the children were dependent, but found them not to be neglected. *Id*. The trial court approved and adopted the magistrate's recommendation on June 7, 2012. *Id*. A judgment entry of the agreed disposition continuing the temporary custody of A.E. and J.E. in the home of Eastman was filed on June 26, 2012. R. 34. The case plan filed by the Agency on June 8, 2012, was approved as filed on June 27, 2012. R. 35. The case plan required Currier to complete the following requirements: 1) cooperate with a psychological evaluation and follow the recommendations; 2) take her prescribed medication as prescribed; 3) participate in mental health counseling and follow the recommendations of her counselor; 4) keep her children from harmful situations by recognizing what situations are harmful; 5) follow all court orders and not engage in criminal activity; 6) participate and complete a parenting class; 7) complete an alcohol/drug assessment and follow recommendations; and 8) sign all releases requested by the Agency. *Id*.

{¶4} On August 1, 2012, the Agency filed an amended case plan after the six month review and the amended case plan was approved by the trial court on August 27, 2012. R. 47. The amended case plan indicated that Currier had completed her parenting class. *Id*. However, the case plan indicated that there

were still several concerns regarding Currier's mental health issues.  *Id*.  On September 7, 2012, the Agency filed a motion for an ex parte order placing A.E. and J.E. in foster care.  R. 59.  The reason for the request was that Eastman had allegedly violated his probation and was in jail awaiting a hearing.  *Id*.  The trial court granted the ex parte motion that same day.  R. 61.  An amended case plan placing the children in foster care was approved by the trial court on September 14, 2012.  R. 66.

{¶5} A review of the case was held on November 13, 2012.  R. 82.  The parties all agreed that it was in the best interests of A.E. and J.E. to remain in the temporary custody of the Agency.  *Id*.  Currier was granted unsupervised visits with the children.  *Id*.  A semi-annual review of the case plan was conducted on January 28, 2013.  R. 92.  The review indicated that Currier was making insufficient progress on the case plan as to making better decisions regarding relationships and violating the order of the trial court that she have no contact with William Omlor ("Omlor").  *Id*.  The trial court approved the amended case plan on February 12, 2013.  R. 93.  The amended case plan required Currier to meet the following requirements:  1) follow all recommendations of the psychological evaluation; 2) take prescribed medication correctly; 3) participate in mental health counseling and follow recommendations; 4) keep children from harmful situations; 5) not engage in criminal activity; 6) follow all court orders; 7)

complete a parenting class; 8) complete an alcohol/drug assessment and follow recommendations; 9) attend and participate in recommended counseling services until successfully discharged; 10) sign all releases requested by the Agency; 11) provide own transportation to and from visitations; 12) learn and demonstrate effective ways to control impulsive decisions; 13) complete joint counseling with Omlor; 14) be honest with case manager and service providers; 15) follow all terms of probation; 16) maintain stable housing; and 17) manage her finances effectively by creating a budget. *Id*.

{¶6} The next case review by the trial court occurred on June 12, 2013. R. 101. At that time, the trial court placed the children in the temporary custody of Currier under protective supervision by the Agency. *Id*. This disposition was agreed upon by all the parties. *Id*. The case plan was amended to reflect this change. R. 102. On July 24, 2013, the Agency filed a motion for an ex parte motion to place the children back into the temporary custody of the Agency. R. 106. The trial court granted the motion the same day. Tr. 107. A full hearing was held on July 26, 2013. R. 111. At that time, the trial court overruled the motion for temporary custody and the children were returned to Currier. *Id*.

{¶7} On July 25, 2013, a semi-annual review of the case plan was conducted. R. 112. The review indicated that Currier had made some progress as to her counseling. *Id*. The recommendation was to continue with temporary

custody by the Agency.[2]  *Id.*  On July 30, 2013, Currier attempted suicide by taking 30 pills.  R. 113.  Currier was subsequently charged with inducing panic and was held at the Seneca County Jail.  *Id.*  J.E. and A.E. were left in the care of Omlor during that time.  *Id.*  The Agency filed a  "Notice to the Court Regarding the Status of These Cases".  *Id.*  Based upon the Agency's filings, the trial court held a hearing and returned the children to the temporary custody of the Agency. R. 118.  On August 7, 2013, the trial court approved the amended case plan returning custody to the Agency and changing the goal back to reunification.  R. 119.  Another amended case plan was approved by the trial court on August 12, 2013.  R. 122.  This case plan required Currier to complete the following objectives:  1) have no direct or indirect contact with Omlor; 2) take her prescribed medication correctly; 3) keep her children safe; 4) not engage in any criminal activity; 5) follow all court orders; 6) sign all releases requested by the Agency; 7) demonstrate effective ways to control impulsive decisions; 8) be honest with all service providers and the case manager; 9) follow terms of probation; and 10) maintain stable housing.  *Id.*

{¶8} On September 4, 2013, Currier filed a motion requesting temporary custody of the children.  R. 124.  That same day, the Agency filed a motion requesting permanent custody of the children.  R. 125.  The Agency alleged that

---

[2] At the time of the review, the ex parte motion giving the Agency temporary custody had not yet been reversed by the trial court.

Currier had been unable to achieve stability in her mental health, impulse control, or housing. *Id.* The magistrate overruled Currier's motion on that same day. R. 130. On November 13, 2013, Currier filed a motion for a new attorney and a new guardian ad litem for herself.[3] R. 140. The basis for the motion was that Currier felt that her guardian ad litem was working with the Agency and not in her best interest and she felt that her attorney was just "worn out" by the case. *Id.* Currier's motion was denied by the magistrate on November 15, 2013. R. 141.

{¶9} On December 4, 2013, the GAL filed her final report. R. 145. The GAL indicated in her report that the frequent changes of care-givers had "had serious negative effects on [A.E.'s] development and acting out behaviors. *Id.* Although the parents have tried to provide a stable environment for the children, they have failed. *Id.* The GAL recommended that permanent custody be granted to the Agency. *Id.* A hearing before the magistrate was held on the motion for permanent custody of the children on December 9, December 10, December 11, December 13, December 16, and December 17, 2013. R. 173. At the hearing, the following relevant testimony was presented by the Agency.[4]

{¶10} Dr. Daniel Cruikshanks ("Cruikshanks") testified that he had completed two evaluations of Currier for the Agency. Tr. 11. The first was

---

[3] Due to Currier's mental health issues, a guardian ad litem had been appointed for her as well as for the children.

[4] Additional testimony relevant to Eastman's parenting is not included as Eastman did not appeal from the trial court's judgment.

completed in January of 2010 and the second was completed in April of 2012. Tr. 12, 43. According to Cruikshanks, Currier suffers from bipolar mood disorder, antisocial personality disorder, and borderline personality disorder. Tr. 15, 20, 53. People with diagnoses like Currier's are extremely difficult to treat because they are incapable of learning from their experiences. Tr. 32, 41. "They're unable to see the consequences that happened as a result of their behaviors to recognize that those, in fact, are the result of the behaviors, and [adjust] their behaviors accordingly." Tr. 41. Cruikshanks was concerned that Currier did not appear to be taking medications correctly and used alcohol to self-medicate. Tr. 60. Cruikshanks testified that based upon the records he has seen, Currier appeared to be repeating the patterns that would be expected of one with her diagnoses. Tr. 66. Her Facebook postings were described by Cruikshanks as "textbook" examples of her clinical profile. Tr. 68-69. An effect of Currier's diagnoses is that it comes with patterns of lying, deceit, and manipulation. Tr. 69. Cruikshanks concluded that in his opinion, there is nothing to indicate that Currier will be able to make any substantial progress in her mental health treatment within the next year. Tr. 70. The only consistency he saw in Currier's life was the predictable chaos and unstable manifestations that surround her. Tr. 71.

{¶11} On cross-examination, Cruikshanks testified that despite alleged reports that Currier was using marijuana, all of her drug screens were negative.

Cruikshanks also testified that many of the scales on the tests he gave Currier were in the normal range. At the time of the 2012 evaluation, Currier's bipolar issues were being effectively managed by medication. Tr. 89. Additionaly, Cruikshanks testified that some people with diagnoses similar to Currier can successfully parent children and that Currier provides adequate care for the children. Tr. 90-98. Finally, Cruikshanks admitted that all of his testimony about the negative consequences on the children was based upon generalized opinions, not on Currier and her children as he did not complete a parental capacity evaluation and had not observed Currier with her children or spoken with the children. Tr. 91.

{¶12} Jesusa Behee ("Behee") testified that she was the caseworker for the 2009-2010 case plan involving Currier and the children. Tr. 104. The children were adjudicated dependent on September 4, 2009, and placed in a kinship placement. Tr. 112-13. The case was closed in 2010 and the children were returned to Currier in August or September. Tr. 133. Behee admitted on cross-examination that Currier would have needed to have substantially complied with the case plan in order to have her children returned to her. Tr. 149. Behee also testified that she supported the reunification of the children with Currier in 2010 and made that recommendation to the court. Tr. 153.

{¶13} The Agency's third witness was the GAL for the children. The GAL testified that the foster home had become home for the children. Tr. 167. J.E.'s

behavior was a little defiant, but was probably learned from his sister.  Tr. 168.  A.E., on the other hand, has many challenging behaviors and will have melt downs where she starts screaming and then suddenly stops.  Tr. 169.  In the GAL's opinion, Currier is very truthful about loving her children and wanting them back, but her chaotic life is damaging to the children.  Tr. 171-72.  The GAL also testified that the children love Eastman and Currier very much.  Tr. 176.  However, due to Currier's subsequent suicide attempt in July where the children were returned to foster care, she recommended that permanent custody be granted to the Agency.  Tr. 180.  On cross-examination, the GAL testified that although the relationship between the children and the foster mother is good, the relationship between J.E. and A.E. is filled with conflict.  Tr. 207, 209.  The GAL was unsure whether the children should be placed together.  Tr. 208.  The GAL also testified that the children love Eastman and that A.E. draws family pictures of her with Currier and Eastman.

{¶14} Jennifer Jaeck ("Jaeck") testified that she is the foster mother and the children were placed with her on September 7, 2012.  Tr. 219.  A.E.'s behavior in the home is troubling as she has tantrums, throws things, lies, and steals.  Tr. 222.  J.E.'s behavior is easier, though he is hard to focus and sometimes angrily screams in her face.  Tr. 223.  Jaeck described A.E. as a manipulative child.  Tr. 226.  Jaeck testified that she did not know if she would be interested in adopting the children.

Tr. 228. On cross-examination, Jaeck testified that the children loved each other, but would fight. Tr. 231. She also testified that she supervised visits between the children and Currier and that they are clearly bonded to each other. Tr. 233.

{¶15} Currier's counselor Patricia Abrahamson ("Abrahamson") also testified for the Agency. Abrahamson testified that she began working with Currier in 2011 due to issues Currier was having with relationships. Tr. 243. Currier left after nine sessions, but returned in 2013 for individual and couple's therapy with Omlor. Tr. 244. In Abrahamson's opinion, Currier's relationship with Omlor was volatile. Tr. 244. Abrahamson's last session with Currier was October 30, 2013, when Currier just stopped appearing. Tr. 245, 248. During counseling, Currier was making progress toward her treatment goals. Tr. 248. Abrahamson testified that she was "devastated" when she learned that Currier had lied to her about having contact with Omlor. Tr. 250.

{¶16} Jason Windsor ("Windsor") of the Tiffin Police Department testified that he was called on July 30, 2013, to help find Currier because she had possibly taken a bunch of pills in a suicide attempt. Tr. 283. He later learned that she was found at Omlor's home. Tr. 284. Prior to that Windsor knew Currier from domestic disturbance calls between Currier and Eastman. Tr. 285. The children were present during those times, but they did not involve physical altercations. Tr. 285. In the years he had worked as an officer, he personally had responded to five

calls involving Currier. Tr. 286. The department as a whole had at least 50 different incidents. Tr. 286. The latest contact he had with Currier was November 4, 2013, when he found her crying in the park, worried about losing her children. Tr. 287-88. He told her to see her counselor, though there were no threats of self-harm at that time. Tr. 287-88. On cross-examination, Windsor clarified that the 50 reports ranged from 2007-2013, were only reports, not charges, and some of them involved Eastman and Omlor as well. Tr. 291.

{¶17} Larry Mackling of the Seneca County Sheriff's Department testified that he responded to a call concerning Currier on July 30, 2013. Tr. 294. He was dispatched to Omlor's home to do a welfare check. Tr. 295. When he arrived, he found her very tired and incoherent. Tr. 295. Currier told him that she had taken 30 Risperidone, one milligram each. Tr. 296. Emergency services were then called. Tr. 296. Over the years, he had personally responded to ten or more calls involving Currier. Tr. 298. Most of the disputes involving Currier and Omlor concerned the parenting of their child. Tr. 300.

{¶18} Crystal Brady ("Brady") testified that she was the managing caseworker for this case and began working with Currier in March of 2012. Tr. 337. The reason for the original complaint was that Currier had taken the children to Omlor's home, in violation of a civil protection order, and had made a suicide attempt with the children present. Tr. 339. The children were adjudicated

dependent on May 8, 2012, and placed in the temporary custody of Eastman. Tr. 339. The children were removed from Eastman's custody on September 7, 2012, when he was arrested for a probation violation. Tr. 343. The children were then placed with Jaeck until they were returned to Currier on June 12, 2013. Tr. 347. The children were returned to Currier because she had made progress on the case plan. Tr. 348. The children were then removed from Currier on July 24, 2013, because she and Omlor had separated and Currier was having trouble meeting the children's basic needs due to her financial limits. Tr. 249. On July 26, 2013, the children were returned to Currier. Tr. 355. The children were then returned to foster care after Currier attempted suicide on July 30, 2013. Tr. 356.

{¶19} Brady testified that Currier had successfully completed the goal of getting a psychological evaluation and correctly taking her medication. Tr. 370. Currier had participated in counseling, but had four different counselors during that time. Tr. 370-71. According to Brady, Currier had stopped seeing Mel Proctor ("Proctor") at the end of May 2013, then saw "Jackie" for a couple weeks before beginning couples counseling with Abrahamson. Tr. 372. Currier then stopped seeing Abrahamson because Currier had lied to her and was afraid to go back. Tr. 373. Currier had then began counseling at Firelands with a new therapist in November 2013. Tr. 373. In Brady's opinion, Currier's progress as to mental health counseling was insufficient because she had not been able to

establish a relationship with a counselor and be honest with them. Tr. 374. Brady also felt that Currier had not made progress concerning keeping the children safe since she had custody of the children when she attempted suicide on July 30, 2013. Tr. 375. Additionally, Currier had taken the children to Omlor's second story apartment after he moved out, and put J.E. on the porch roof so that he could help her break into Omlor's apartment. Tr. 376. In the prior six months, Brady had seen five to ten police reports regarding Currier. Although Currier reported that she had learned some techniques to help her control her impulsive behavior, Brady did not see any progress in the area of honesty. Tr. 379. Additionally, Currier had not signed a release for them to get information from her obstetrician, though she was bringing them reports from the doctor. Tr. 382. Finally, Currier has failed to maintain stable housing in Brady's opinion. Tr. 386. Currier had been hospitalized twice for suicide attempts and appears to put her romantic relationships before her children. Tr. 401-402. Brady recommended that permanent custody be granted to the Agency. Tr. 408.

{¶20} On the positive side, Brady testified that the children interact well with Currier. Tr. 385. On cross-examination, Brady admitted that Currier had made good parenting decisions. Tr. 439. Brady also admitted that the fact that Currier's psychiatrist has not returned reports to the Agency is not Currier's fault, but just reluctance on the part of the doctor. Tr. 441. Currier's obstetrician had

sent confirmation that Currier was in compliance with her medication. Tr. 441. Brady testified that the counseling with Proctor ended because Currier had completed all the goals he had set for her. Tr. 443. Currier had switched from Proctor to "Jackie" for couple's counseling, and then switched to Abrahamson because Jackie's internship was ending and Currier was going to be switching no matter what she wanted. Tr. 447. Brady admitted that Currier was compliant with her probation requirements, had passed the drug and alcohol screening, and had had no positive drug screens. Tr. 455, 468. The only area where Currier was dishonest was in regard to her relationship with Omlor. Tr. 454. Currier also had been required to stop taking the psychotropic medicine while pregnant. Tr. 496. Finally, Brady testified that Currier loves her children and provides care for them. Tr. 501.

{¶21} Currier then testified on her own behalf. Currier testified that she had been living in a duplex in Tiffin since August 2013. Tr. 556. All rent and utilities were paid and she was employed as a cashier at a local gas station. Tr. 558. Currier had a valid driver's license, a vehicle, and insurance on the vehicle. Tr. 5559. Currier testified that she was, as of the hearing, taking Zoloft for depression and Vistaril Hydroxyzine for her anxiety, as prescribed by her obstetrician. Tr. 561. Once her baby was born, she intended to return to her psychiatrist for management of her medications. Tr. 563.

{¶22} At the time of the hearing, Currier testified that she was receiving mental health counseling at Firelands. Tr. 564. At Firelands, she has a case manager who helps her with getting services and classes she needs. Tr. 565. She also has a counselor who is helping her work on her trust issues. Tr. 565. Currier admitted that she had lied to Abrahamson about her relationship with Omlor. Tr. 568. According to Currier, she did so because Abrahamson had made her dislike of Omlor clear and Currier did not feel it was productive to discuss it with Abrahamson. Tr. 568. As to her prior counselors, Currier testified that Proctor had released her from counseling because she had met the goals he had set. Tr. 571. She then went to Jackie for couples counseling, but found a new counselor when Jackie's internship ended. Tr. 571. Currier admitted that her mental health "goes down when [she's] in relationships" and she then makes poor decisions. Tr. 573. She testified that the first "suicide attempt" was not really meant to kill herself, but to express her frustration and anger with Omlor. Tr. 573. Currier acknowledged that the children should not have seen that and that it was not healthy for them. Tr. 574. Currier testified that she now understood that she has to take time to become her own person before she can build a relationship with someone else. Tr. 578.

{¶23} Currier admitted that she had often violated court orders not to see Omlor. Tr. 582. She felt that since that relationship had reached a final

conclusion, she was better at controlling her impulsive decisions. Tr. 587. Although she has lied in an effort to manipulate people, she was only dishonest with the caseworker as it related to her relationship with Omlor. Tr. 591. Currier testified that she did not believe she would be able to manipulate her new counselor due to the counselor's background treating drug addicts, but admitted that she had manipulated Abrahamson. Tr. 593.

{¶24} Currier testified that her children are very attached to her, that she loves them, and that they love her. Tr. 595-96. She also claims that she was careful to make sure the kids were not present when she took the pills in her second suicide attempt. Tr. 599. Although Currier is angry, she identifies this anger as different than her prior anger. Tr. 603. Her prior anger was a rage, this is anger at herself for not working harder at getting her kids than at forming a relationship. Tr. 603.

{¶25} On cross-examination, Currier admitted that on July 30, 2013, she took 30 pills, but did not know why, only that she felt everything was hopeless. Tr. 619. She admitted to lying to Brady about the number of pills she took because she was afraid they would take her children. Tr. 619. She also admitted that she had made a comment that J.E. had made her uncomfortable, but that it was not him, but rather his behavior was inappropriate – i.e. sexual in nature, and she

was concerned that it was not being addressed.[5] Tr. 621. Currier agreed that the children needed to continue in counseling and suggested they could be counseled at Firelands as well. Tr. 624-25.

{¶26} The magistrate also conducted in camera interviews with A.E. and J.E. A.E. indicated that her first choice would be to live with Eastman, but she wanted to visit with Currier for three days in a row. Tr. 664-67. She also indicated that she would like to visit with Jaeck. Tr. 664-67. A.E. described her visits with Currier as good. Tr. 668. J.E. indicated that he would like to live with Jaeck, but indicated that his second choice would be Currier and Eastman equally. Tr. 671-72. J.E. also indicated that he likes being with his sister, A.E. Tr. 673.

{¶27} On December 23, 2013, the Agency filed its closing arguments. R. 158. Currier filed her closing arguments on December 27, 2013. R. 160. On that same day, Currier's counsel filed a motion to withdraw. R. 161. The motion was granted by the trial court on December 31, 2013, and a new attorney was appointed for Currier. R. 162 and 163. On January 2, 2014, the magistrate issued its recommendation that Currier's parental rights be terminated and permanent custody of the children be granted to the Agency. R. 164. The trial court

---

[5] Interestingly, soon after Currier reported inappropriate sexual behavior and the children were returned to the foster home, the foster mother reported finding J.E. and another boy in the bedroom engaging in inappropriate behavior. Jaeck reported that J.E. told her the other boy had told him how to play the game. The response was that since J.E. was in respite care, he could sleep anywhere, so not to let J.E. and the other boy sleep in the same room anymore. Jaeck was told to explain to the boys that it was wrong and to "[e]xplain to [Currier] that children explore but they need to understand what is appropriate." R. 110, Father's A.

approved and adopted the magistrate's recommendation that same day. *Id.* On

January 15, 2014, Currier's new counsel filed preliminary objections to the

magistrate's decision and requested an extension to file additional objections. R.

166. Currier's supplemental objections to the magistrate's decision were filed on

March 28, 2014. R. 177. The Agency filed its response to the objections on April

14, 2014. R. 178. On May 6, 2014, the trial court overruled the objections and

granted the Agency's motion for permanent custody. R. 179. Currier filed her

notice of appeal from this judgment on June 4, 2014. R. 184. On appeal, Currier

raises the following assignments of error.

### First Assignment of Error

**The trial court erred when it failed to appoint [Currier] new counsel after both [Currier] by motion and trial counsel on the record at hearing agreed the relationship was in such a state that effective representation and communication between client and counsel was impossible in violation of her due process rights. [Currier's] due process rights were further violated when the trial court granted trial counsel's motion to withdraw before the magistrate's decision was filed and [Currier's] wishes as to objections were considered.**

### Second Assignment of Error

**[Currier's] due process rights were violated by trial counsel's ineffective assistance. Trial counsel failed to secure an independent expert to assist in [Currier's] defense when [Currier's] mental health was the central issue in the [Agency's] case. Trial counsel further failed to object to the portions of testimony from the [Agency's] expert where he relied upon hearsay that was provided either directly from the case worker or in reports provided by the [Agency]. Trial counsel failed to**

**call any witnesses in [Currier's] defense in a permanent custody proceeding, a proceeding known [as] the death penalty of juvenile law.**

### Third Assignment of Error

**The trial court's judgment should be reversed because it was against the manifest weight of the evidence in finding there was clear and convincing evidence sufficient to grant [the Agency's] permanent custody motion or in finding that [the Agency] used reasonable efforts to return the child to one of his parents.**

In the interest of clarity, we will address the assignments of error out of order.

{¶28} In the third assignment of error, Currier claims that the trial court's findings were against the manifest weight of the evidence. The right to raise one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. Hancock No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

**(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the**

**best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(2) With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**\* \* \***

**(E) In determining at a hearing held pursuant to division (A) of this section \* \* \* whether a child cannot be placed with either**

**parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

**\* \* \***

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

R.C. 2151.414. A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established. *See In re B.G.W.,* 10th Dist. Franklin No. 08AP-081, 2008-Ohio-3693 and *In re Nevaeh J.*, 6th Dist. Lucas No. L-06-1093, 2006-Ohio-6628, ¶ 17 (citing *In re Forrest S.*, 102 Ohio App.3d 338, 657 N.E.2d 307 (6th Dist. 1995)).

{¶29} A review of the record in this case indicates that there was substantial evidence presented that Currier suffers from a bipolar mood disorder, anti-social personality disorder, and borderline personality disorder. As a result of these issues, she is resistant to treatment and places her own desires ahead of the needs of the children. No one denied that Currier loved her children or that they loved her. Everyone testified that there was a strong bond between Currier and the children and that she was capable of making good parenting decisions when her mental illness was not an issue. However, there was ample testimony that Currier has repeatedly placed the children in dangerous situations and has provided little stability for them. As recently as July 2013, Currier attempted to commit suicide by overdosing. Although the children did not witness this attempt, her feelings of hopelessness caused her to make a decision without considering the needs of her children or the effect her decision would have on her children. The pattern of this type of behavior has been repeated numerous times. This has put her children in a position of desiring to spend time with her, but preferring to live with other people. The testimony was clear that it was unlikely that Currier would be able to care for her children within the next year and that the children needed stability. Thus, the judgment of the trial court was not against the weight of the evidence. The third assignment of error is overruled.

**{¶30}** In the first assignment of error, Currier claims that the trial court erred by not granting her motion for new counsel, which was made approximately a month before the hearing.

> **In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict. * * If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right. * * * In the absence of a conflict which presents such a Sixth Amendment problem, the trial court has discretion to decide whether to grant a continuance during the course of trial for the substitution of counsel, and that decision will be reversed only if the court has abused its discretion.**

*United States v. Calabro*, 467 F.2d 973, 986 (2nd Cir.1972) (citations omitted). "In the absence of such a Sixth Amendment concern, the decision of a trial court to refuse substitution of counsel will be reversed only if the court has abused its discretion." *State v. Richey*, 6th Dist. Sandusky No. S-09-28, 2011-Ohio-280, ¶30.

**{¶31}** On November 13, 2013, Currier submitted a motion to the court requesting new trial counsel. R. 140. The basis for the motion was that Currier did not trust her attorney and felt that her attorney was disclosing confidences to the Agency. *Id*. The motion was overruled without a hearing on November 15,

2013.[6] R. 141. The motion was denied because the matter was set to be heard starting December 8, 2013, and six days had already been set aside. *Id.* The magistrate determined that the motion was for the purpose of delaying the proceedings. *Id.* In addition, counsel for Currier advised the trial court that there was an issue between her and Currier which was "creating a significant ineffectiveness for Ms. Plummer [Currier's GAL] and I." Tr. 323. In handling the issue, the magistrate merely told Currier that he had appointed "the most competent and diligent counsel" that he could find. Tr. 326. The magistrate also told Currier that her counsel had "done a fine job advocating for [Currier]. Tr. 327. Currier did not renew her motion for new counsel. Apparently, the biggest problem between Currier and her counsel was that Currier did not trust her counsel. However, on appeal, Currier does not indicate how this prejudiced her. A review of the record indicates that Currier's counsel was prepared for the hearing, had issued a subpoena for a witness, fully cross-examined the witnesses, and generally protected the interests of her client. Based upon the record before this court, we cannot find that the trial court abused its discretion in denying Currier's motion for new counsel. The first assignment of error is overruled.

{¶32} In the second assignments of error, Currier claims that she was denied effective assistance of counsel.

---

[6] The magistrate stated there was a "non-oral hearing", but the only thing reviewed was the letter as no other party had filed a reply. The magistrate states that the letter has been reviewed. This is not a "hearing" of any kind, it is merely a ruling on the motion.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**

> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. See Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; * *915 State v. Jackson, 64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999–Ohio–102, 714 N.E.2d 905.

**{¶33}** Currier alleges that her counsel was ineffective for three reasons: 1) failing to obtain an independent psychological evaluation and expert to counteract the testimony of Cruikshanks; 2) failing to object to Cruikshanks testimony and report that was based upon hearsay evidence not admitted; and 3) failing to call additional witnesses to support Currier's case. We will first address the failure to obtain an independent psychological evaluation. The law in Ohio is well settled that when the mental health of a parent is the predominant issue in a permanent

custody case and the State requires the parent to have a mental health evaluation by the expert chosen by the State, the parent is entitled to have an independent expert evaluation done at the expense of the State. See *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist. 1993); *In re Brown*, 1st Dist. Hamilton No. C-850878, 1986 WL 13385 (Nov. 26, 1986); *In re Elliott*, 7th Dist. Jefferson Nos. 03JE30, 03JE33, 2004-Ohio-388; *In re Harmon*, 4th Dist. Scioto No. 00CA2694, 2000 WL 1424829 (Sept. 25, 2000); *In re Hogle*, 10th Dist. Franklin No. 99AP-944, 2000 WL 33231609 (June 27, 2000); *In re Jeffrey S.*, 6th Dist. Lucas No. L-96-178, 1998 WL 879652 (Dec. 18, 1998); and *In re Egbert*, 99 Ohio App.3d 492, 651 N.E.2d 38 (12th Dist. 1994). There is no dispute that in this case Currier's mental health was the predominant issue and her counsel did not request an independent evaluation. However, Currier bases the alleged ineffectiveness on the premise that if an independent evaluation had been obtained and *if* that evaluation had revealed a different result, then Cruikshanks testimony would not have been as damaging. The record is devoid of any evidence that the results would be different. Without this evidence, this court has no basis for determining that the alleged error would have affected the outcome and thus is harmless.

{¶34} Currier also claims that her counsel was ineffective for failing to object to Cruikshanks reference to hearsay evidence as the basis for his

conclusions without said evidence being admitted. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." Evid.R. 703. There is no question that Cruikshanks last met with Currier in 2012. His opinion of her current situation was based on police reports and agency records, most of which were not admitted as evidence at trial. Thus, the admissibility of his opinion could have been challenged pursuant to Evidence Rule 703. However, this was a trial to the bench and there was other evidence regarding Currier's mental state. Her counselor through November of 2013 testified as to her mental state. There was testimony presented that in July of 2013, Currier had attempted suicide. There was testimony regarding her many interactions with law enforcement based upon her mental health. Given all of the evidence, we cannot say that the outcome would have been different if the objectionable material was excluded. Thus, Currier's counsel was not ineffective for failing to object to it.

{¶35} Finally, Currier claims that her counsel was ineffective for failing to call additional witnesses. The decision of counsel whether to call witnesses is a matter of trial strategy that will not usually be second guessed on appeal. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶113. The record contains no proffer as to what the additional witnesses would have said. Although Currier claims that the witnesses could have shown that she was a good parent,

this issue was not in dispute. Even the Agency admitted that Currier had good parenting skills and took care of her children. However, the issue was that when Currier was having times of instability due to her mental health issues, she did not provide good care for the children. Instead, Currier exposed them to dangerous situations and trauma as they witnessed her irrational behavior caused by her mental illness. This court has no evidence before it that would indicate that the witnesses could have testified to this issue, thus this court cannot find that the outcome likely would have been different. The result is that Currier's counsel was not ineffective for failing to call additional witnesses. Based upon the record before us, the second assignment of error is overruled.

{¶36} Having found no error in the particulars assigned and argued, the judgments of the Court of Common Pleas of Seneca County, Juvenile Division, are affirmed.

*Judgments Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**