[Cite as *In re G.N.*, 2025-Ohio-4999.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

IN RE:

    G.N.,

**CASE NO. 10-24-09**

ADJUDICATED NEGLECTED
AND DEPENDENT CHILD.

**OPINION AND
JUDGMENT ENTRY**

[ALICIA N. - APPELLANT]
[CATLIN N. - APPELLANT]

---

IN RE:

    H.N.,

**CASE NO. 10-24-10**

ADJUDICATED NEGLECTED
AND DEPENDENT CHILD.

**OPINION AND
JUDGMENT ENTRY**

[ALICIA N. - APPELLANT]
[CATLIN N. APPELLANT]

---

**Appeals from Mercer County Common Pleas Court
Juvenile Division
Trial Court Nos. 3-2022-051 and 3-2022-052**

**Judgments Affirmed**

**Date of Decision: November 3, 2025**

**APPEARANCES:**

*Thomas Lucente, Jr.* **for Appellant, Catlin N.**

*Christopher Bazeley* **for Appellant, Alicia N.**

*Rebecca S. King-Newman* **for Appellee**

**MILLER, J.**

{¶1} Catlin N. and Alicia N. appeal the November 15, 2024 judgments of the Mercer County Court of Common Pleas, Juvenile Division, placing G.N. and H.N. in the permanent custody of the Mercer County Department of Job and Family Services ("the Department"). For the reasons that follow, we affirm.

{¶2} Notices of appeal in both cases were also filed by Acobie Yoder ("Yoder"), the adult half-brother of G.N. and H.N. However, Yoder, a non-party, failed to file appellate briefs or articulate any assignments of error. Accordingly, Yoder's appeals are dismissed for lack of standing and want of prosecution. *See* App.R. 18(C).

*Facts and Procedural History*

{¶3} Alicia N. and William N.[1] are the biological parents of G.N. (born 2009). Catlin N. and Alicia are the biological parents of H.N. (born 2015). On

---

[1] Initially, Alicia indicated that Catlin was also the biological father of G.N. However, the Department located G.N.'s birth certificate listing William as the father, and subsequent paternity testing confirmed William as the father of G.N. The Department made contact with William who indicated that he does not have a relationship with G.N. and did not desire to be part of the Department's case plan. The Department reached out to William on several occasions until he reportedly blocked the caseworker's telephone number.

September 29, 2022, Alicia was arrested by the Coldwater Police Department on an outstanding warrant. Alicia had an additional felony warrant from the State of Indiana, with a request for her extradition. Catlin was living several hours away, and it was unclear when he would arrive to care for G.N. and H.N. Accordingly, the Coldwater Police Department removed the children from the home. Later that day, a shelter-care hearing was held and the trial court found probable cause to remove the children and that the Department had made reasonable efforts to prevent the removal and find a relative placement. The same day, the Department filed complaints alleging that G.N. and H.N. were neglected children pursuant to R.C. 2151.03(A)(2) and dependent children pursuant to R.C. 2151.04(C) and requesting the trial court place the children in its protective supervision.

{¶4} An adjudication hearing was held on November 18, 2022. After hearing the evidence presented by the parties, the trial court found that G.N. and H.N. were neglected and dependent children. A disposition hearing was held on December 16, 2022. At that hearing, Alicia raised concerns alleging that her due process rights were violated upon her arrest. She further alleged that the removal of her children was not justified because there was allegedly an adult in the residence who could care for the children upon her arrest and, further, Catlin was traveling to the residence from his home in Michigan to care for the children upon Alicia's arrest. Alicia and Catlin both made motions to dismiss the case, which the trial court overruled. After hearing the evidence presented by both parties, the trial court

-3-

continued the children in the temporary custody of the Department. The trial court also approved the case plan which allowed Alicia and Catlin supervised visitation with the children and included the requirement that Alicia and Catlin complete twice weekly drug screens to exercise that visitation.

{¶5} On May 31, 2024, Catlin filed motions for custody of G.N. and H.N. On July 11, 2024, the Department filed motions for permanent custody of the children.

{¶6} On August 9, 2024, the Department made motions to suspend visitation between Alicia, Catlin, and the children immediately due to allegations that Alicia provided G.N. with a THC vape pen during a visit. Later that day, the trial court granted the Department's motions to suspend visitations. On August 20, 2024, Alicia filed motions requesting the trial court reinstate her visitation rights with appropriate safeguards. The Department filed its briefing in opposition to Alicia's motions.

{¶7} On August 20, 2024, Alicia filed requests for the trial court to conduct in-camera interviews of the children. On September 27, 2024, the trial court filed judgment entries denying Alicia's motions for in-camera interviews. On October 17, 2024, Alicia filed motions requesting that the trial court consider placement of the children with her adult son, Yoder.

{¶8} A permanent custody-hearing was held on October 31, 2024 and November 1, 2024. On November 15, 2024, the trial court filed its judgment entries

granting permanent custody of G.N. and H.N. to the Department. Accordingly, the trial court found Catlin's motions for legal custody and Yoder's motions[2] requesting the court consider placement of the children with him to be moot.

{¶9} Alicia filed her notices of appeal on December 12, 2024. She raises three assignments of error for our review. On December 13, 2024, Catlin filed his notices of appeal.[3] He raises five assignments of error for our review. Due to the considerable overlap between Alicia's assignments of error and Catlin's assignments of error, we elect to address the assignments of error in an order that facilitates our resolution of the case.

## Alicia's First Assignment of Error

**The trial court's decision terminating [Alicia's] parental rights is not supported by the weight of the evidence.**

{¶10} In her first assignment of error, Alicia argues that the trial court erred by finding that the Department proved by clear and convincing evidence that the Department should be granted permanent custody of G.N. and H.N. and that the trial court's decision to grant permanent custody to the Department was in the children's best interest.

*Manifest-Weight Review of Permanent-Custody Decisions*

---

[2] The trial court considered the motions relating to Yoder's desire to be considered for placement of the children as though they had been filed by Yoder; however, we note that the motions were actually filed by Alicia on October 17, 2024.

[3] We note that in his appellate brief, Catlin frequently makes arguments relating to G.N. despite not being a party in that case. Additionally, he makes several arguments relating to the trial court's decisions with respect to Alicia and William. We will consider Catlin's arguments in this regard only to the extent that he has standing to make such challenges and as they may relate to H.N and his motions for custody of both children.

**{¶11}** "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.""" *In re Dn.R.*, 2020-Ohio-6794, ¶ 16 (3d Dist.), quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001).

**{¶12}** In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children

services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.).

{¶13} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 2016-Ohio-7057, ¶ 20 (5th Dist.). "A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the '"exceptional case in which the evidence weighs heavily against the [decision]."'" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

*Standard & Procedures for the Termination of Parental Rights*

{¶14} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be

-7-

terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

{¶15} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 2018-Ohio-125, ¶ 12 (3d Dist.), citing *In re B.C.*, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 2015-Ohio-2740, ¶ 13 (3d Dist.). "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 2017-Ohio-4218, ¶ 10 (3d Dist.).

As relevant to this case, R.C. 2151.414(B)(1) provides:

[T]he court may grant permanent custody of a child to a movant if the court determines at a hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

. . .

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period[.]

R.C. 2151.414(B)(1)(d).

**{¶16}** "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 2017-Ohio-142, ¶ 23 (3d Dist.), quoting *In re A.F.*, 2012-Ohio-1137, ¶ 55 (3d Dist.) and citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

**{¶17}** "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.* at ¶ 24, citing *In re H.M.*, 2014-Ohio-755, ¶ 27 (3d Dist.). The factors specifically listed in R.C. 2151.414(D)(1) are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period. . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations. No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16.

*Analysis*

{¶18} Alicia does not dispute that the children have been in the Department's temporary custody for 12 or more months of a consecutive 22-month period at the time the Department filed its motion for permanent custody. Therefore, she does not challenge the trial court's determination that R.C. 2151.414(B)(1)(d) applies to the children. Rather, in her assignment of error, Alicia argues that the trial court erred by determining that granting the Department permanent custody is in the children's best interest. However, after examining the trial court's findings and reviewing the record, we conclude that clear and convincing evidence supports the trial court's best-interest determination.

*R.C. 2151.414(D)(1)(a)*

{¶19} With respect to R.C. 2151.414(D)(1)(a), the trial court found, with respect to H.N. as follows:

> [T]he Court finds that the parents have failed to address their respective drug abuse issues, and have demonstrated through their lack of visitation and inappropriate conduct during that visitation that the child is in need of a legally permanent, stable placement.

> The child is firmly bonded with the foster family. The foster parents have indicated a desire to provide a stable home for the child for the long term.

(Case No. 3-2022-052, Nov. 15, 2024 Judgment Entry).

{¶20} As it relates to G.N., the trial court made identical findings relating to Alicia's failure to address her drug abuse issues as demonstrated through her lack of visitation and conduct during the visitations. The trial court found that William "has abandoned" G.N. With respect to his bonds to the foster family, the trial court also found that G.N. is "firmly bonded" and that the foster family desires to provide a stable home for G.N. long-term.

{¶21} At the permanent-custody hearing, Latasha Miller ("Miller"), the initial caseworker, testified that Alicia initially missed many visitations due to her refusal to complete the drug screens that the case plan required in order for her to receive visitation. Additionally, Miller reported that when Alicia did exercise her rights to supervised visits, she had to be repeatedly corrected not to discuss the case with the children. Although Alicia would redirect the conversation after being corrected by Department staff, inevitably, at subsequent visits the same concerns would arise.

{¶22} The Department provided evidence that the children are living with the same foster family and have a strong and secure attachment with the foster family. The caseworker testified that in her observations, both children appear comfortable and happy in the foster home and have positive interactions with the

foster parents and foster siblings and with each other. The caseworker testified that although, initially, G.N. and H.N. struggled to get along with each other, there has been a substantial improvement in their interactions with one another.

{¶23} G.N.'s school counselor, Sue Lovell ("Lovell") testified that she got to know the foster family during her involvement with G.N. and that the foster family was "[v]ery involved." Lovell observed that the foster father "had a visibly good relationship" with G.N. and was particularly close to him. Additionally, G.N. also got along well with his foster mother. Lovell further testified that it was "very evident" that the foster parents were "very supportive" of G.N. and encouraged him to get involved in extracurricular activities. Yoder opined that G.N.'s closest friend was his foster brother.

{¶24} G.N. and H.N.'s counselor, Aimee Highley ("Highley"), testified regarding the children's progress and continuing concerns. Highley stated that G.N. has expressed concerns regarding his relationship with Alicia. As a result of those conversations, Highley and G.N. worked on challenging his belief systems, specifically regarding the roles of children versus the role of a parent because in his relationship with Alicia, G.N. was frequently in the role of a parent.

{¶25} According to Highley, H.N. is "avoidant" when she and H.N. address H.N.'s feelings about her relationship with her mom. In contrast, Highley described that H.N. has an "emotion of belonging" in her current placement. The counselor testified that, H.N. requires stability and the counselor testified that she would have

concerns about H.N. if she were removed from her foster family. The counselor also testified that H.N. was not anxious about being separated from Alicia.

**{¶26}** For her part, a number of Alicia's family and friends testified on her behalf regarding her relationship with her children. Avery Eternecka ("Eternecka"), Alicia's sister, testified that Alicia, G.N., and H.N. are "best friends" and "three peas in a pod." She testified that, in her opinion, Alicia is "a perfect parent." Yoder, Alicia's adult son and H.N. and G.N.'s half-brother, testified that that Alicia has done "an amazing job" raising him and his two half-siblings. Yoder opined that his half-siblings are not as happy in their foster home as they were when they were living with Alicia. Several witnesses testified regarding Alicia's enjoyment of cooking for her children and the playful relationship they enjoy.

**{¶27}** In its judgment entries granting permanent custody, the trial court summarized Alicia's character witnesses as follows:

> Mother offered numerous character witnesses who all noted mother's ability to cook and everyone saw a great relationship between Alicia and her kids. These character witnesses were not entirely credible given their disbelief and/or the government was out to get Alicia mentality when confronted with facts, such as mother passing her son vapes on several occasions and testing positive for methamphetamine. In fact, one witness, Cadence Snider, the girlfriend of mother's oldest son testified that if her boyfriend were given custody of the children on his motion for legal custody that the children would, "need counseling to establish trust in the legal system." She also stated that she does not believe the positive drug results for methamphetamine because she had "[d]one her own research on Adderall and the fact that it created false positive tests."

(Nov. 15, 2024 Judgment Entries).

{¶28} Based on the evidence presented at the trial, it is clear that the children are well-bonded with her foster family and feel a sense of belonging around them. It is also clear that Alicia loves her children, but that her own actions, such as failing to comply with the case plan by not completing the required drug screens, testing positive for methamphetamine, and repeatedly discussing the case with the children and speaking poorly of the foster family, has negatively impacted the children's relationship with Alicia. Accordingly, record supports the trial court's findings under R.C. 2151.414(D)(1)(a).

*R.C. 2151.414(D)(1)(b)*

{¶29} Regarding R.C. 2151.414(D)(1)(b), in its judgment entries granting permanent custody to the Department, the trial court found that "[t]he CASA provided her report and recommendation in accordance with Rule of Superintendence 48. She voiced her opinion prior to the conclusion of the hearing that she felt that a Permanent Custody finding would be in the best interest of this child." The guardian ad litem's report detailed the children's desire to stay in the home of their foster family.

{¶30} Accordingly, we find that granting permanent custody was in concert with the desires of the children as described by the guardian ad litem in her report.

*R.C. 2151.414(D)(1)(c)*

As to R.C. 2151.414(D)(1)(c), the trial court found as follows:

> In this case, the uncontroverted evidence shows that the child has been in the temporary custody of the Department for 12 or more months of a consecutive 24-month period. The Department testified that the child was placed in foster care in October of 2022 and was still in foster care as of the date of this hearing. Also, uncontroverted in the testimony, is that there was only a brief period of time where [Alicia and Catlin] [exercised] unsupervised visitation.

(Nov. 15, 2024 Judgment Entries).

{¶31} It is not contested that the children were in the temporary custody of the Department beginning in October 2022 and were consistently in the care of the Department since that time. Additionally, according to the testimony adduced at trial, Alicia and Catlin's visitation with the children was not consistent and was, aside from a brief period, supervised. Furthermore, the testimony at the hearing indicates that the reason that the visitation was not consistent or unsupervised was due to Alicia and Catlin's lack of compliance with the required drug screens, positive drug screens, and failure to comply with visitation. For instance, on several instances, Alicia missed visitation due to issues with transportation. Furthermore, several witnesses testified to the turmoil and difficulty that the inconsistent visits caused for the children. Most recently, visitations were suspended by the Agency due to an allegation that Alicia provided G.N. with a THC vape.

{¶32} Thus, after reviewing the evidence presented at the permanent-custody hearing, we find that the record supports the trial court's findings under R.C. 2151.414(D)(1)(c).

*R.C. 2151.414(D)(1)(d)*

**{¶33}** With respect to R.C. 2151.414(D)(1)(d), the trial court found that G.N. and H.N. "cannot and should not be placed with either parent within a reasonable time." The trial court cited Alicia and Catlin's failures to remedy their "issues with illicit drug use, potential mental health issues, and inability to maintain bonds" with G.N. and H.N. With respect to G.N., the trial court found that William has abandoned him.

**{¶34}** The trial court also made the following findings with respect to both children:

> The Court further finds that Permanent Custody is the only available means, at this time of providing permanency and stability. Despite mother's insistence that the words on the initial Case Plan that there is an "unmistakable bond between the mother and child," the child's best interest [is] reserved by remaining in a stable, permanent placement with the foster parents.

(Nov. 15, 2024 Judgment Entries).

**{¶35}** The record supports the trial court's findings that permanent custody is the only available means of providing permanency and stability to the children. Several reoccurring issues, most notably, Alicia and Catlin's illicit drug use continued to be a concern throughout the case.

**{¶36}** As part of the case plan, Alicia and Catlin were required to be drug screened twice a week in order to exercise visitation with the children. However, Mindy Serr ("Serr"), one of the caseworkers, testified that as of summer 2024, out of the 163 possible visits for Alicia and Catlin, Alicia attended 63 visits (38% of the visits offers) and Catlin attended 41 visits (25% of the visits offered). Relatedly, of

the 280 drug screens that Alicia and Catlin were required to complete to maintain visitations and case plan requirements, Alicia skipped or refused to test 99 times and Catlin skipped or refused to test 253 times. Alicia tested positive for substances 166 times and negative for all substances, including THC, 15 times. Catlin tested positive for substances 26 times and negative for all substances only once. In addition to THC, Alicia tested positive for methamphetamine a number of times and tested positive for cocaine once.

{¶37} For her part, Alicia denied that she uses illicit drugs, specifically methamphetamine. Rather, she contends that her prescription for Adderall can result in a false positive drug screen for methamphetamine. However, the testimony of Jerome Reed ("Reed"), the certified scientist from Forensic Fluids lab contradicted this claim by his testimony that Adderall could not return a false positive screen for methamphetamine.

{¶38} In addition to concerns regarding her drug use, Alicia and Catlin's visitations were suspended as a result of an incident in which G.N. received a THC vape during a visitation with Alicia and Catlin. Alicia was interviewed with law enforcement as a result of the situation and the officer testified at the permanent-custody hearing that Alicia admitted that she gave G.N. the THC vape and cartridge. However, Alicia testified that although she does not vape herself, it was possible that G.N. took the vape from her purse without her knowledge. Alicia alleged that

although she did not provide the vape to G.N., she would suffer the consequences in order for G.N. not to get into trouble for stealing it from her.

**{¶39}** Furthermore, when the children entered foster care, they had reportedly been homeschooled by Alicia for the last several school years and both children were significantly behind academically. Lovell, G.N.'s school counselor testified that G.N. entered school approximately two years behind his peers. Lovell detailed the school's concerns that G.N. had received no academic instruction for several years and detailed the efforts taken by the school and G.N. to help fill in the gaps in his education. Lovell testified that G.N. worked hard and with the support of his teachers, was able to make up significant ground academically.

**{¶40}** Evidence was presented that, in the foster parents' care, H.N. has been attending school and thriving in that environment. It was reported by several witnesses that H.N. "loves" school and enjoys being involved in extracurricular activities, such as baton twirling.

**{¶41}** Lovell and Dan Pohlman ("Pohlman"), the principal of Coldwater Middle School, testified regarding concerns relating to G.N.'s behavior in school. Specifically, they testified that G.N. did not have notable behavioral issues during his first year at Coldwater Middle School. Pohlman described G.N. as very polite, but noted that G.N. preferred talking to adults initially because the social setting of school was not something that he was used to after his years being homeschooled. Lovell and Pohlman noted that beginning in the fall of his eighth-grade year, G.N.

started getting into trouble. Pohlman described an issue in which G.N. refused to put his cell phone away after being instructed to do so by a teacher. Pohlman recalled G.N. being concerned about being able to send text messages to his mother. Around this time, Lovell and Pohlman also noted G.N. beginning to have difficulties socially and began to distance himself from his friends. Several more incidents occurred, including a final incident in which G.N. hit another student. Following that incident, school officials determined that G.N. should transfer to the educational service center ("ESC"). The principal of the ESC testified that after a period of adjustment, G.N. began to excel in that environment and continues to thrive.

{¶42} Lovell and Pohlman testified that during the period of time that G.N. was having behavioral issues at school, they came to realize that the behavioral issues correlated with Alicia missing visitations with G.N. Specifically, they began to pinpoint that a lot of the behaviors would happen on Fridays and visits with Alicia were on Wednesdays and Thursdays. When school officials met with a team of people after a behavior happened, they discovered that the behavior would correspond to a "rough visit" or a missed visitation.

{¶43} Evidence was introduced that H.N. has been in therapy since the beginning of the case to address some behavior concerns and other mental health concerns. Her counselor, Highley, testified that H.N. has made significant progress in counseling, formed secure bonds with her foster parents, and benefited from her foster family's support in managing her emotions. Highley also testified that H.N.

has a sense of belonging in her foster home. Alicia alleges that G.N. and H.N. have had no behavior problems whatsoever prior to entering foster care and she blames the removal of the children from her home as the sole cause of her children's behavioral concerns or mental-health challenges.

{¶44} After reviewing the testimony and evidence elicited from the permanent-custody hearing in concert with the trial court's findings, we find that the trial court's findings under R.C. 2151.414(D)(1)(d) were supported by the record.

*R.C. 2951.414(D)(1)(e)*

{¶45} The trial court did not make specific findings that any of the factors in R.C. 2941.414(E)(7) to (11) applied, and upon review of the record, we likewise do not find that any of those factors are applicable in the instant case.

*Conclusion*

{¶46} In sum, competent and credible evidence supports each of the trial court's best-interest findings. Considering the evidence of the children's bond with the foster family, the length of time they have been in the Department's custody, and Alicia and Catlin's failure to comply with the case plan and remedy the conditions that required the continued removal of the children from Alicia and Catlin's homes, clear and convincing evidence supports the trial court's determination that granting permanent custody to the Department is in G.N. and H.N.'s best interest. Therefore, we conclude the trial court's decision awarding

-20-

permanent custody of G.N. and H.N. to the Department is not against the manifest weight of the evidence.

{¶47} Alicia's first assignment of error is overruled.

**Alicia's Second Assignment of Error**

**The trial court abused its discretion when it overruled [Alicia's] motion for an in camera interview with the children.**

{¶48} In her second assignment of error, Alicia argues that the trial court abused its discretion by not granting her motions for in-camera interviews with the children.

{¶49} When determining the best interest of a child in a permanent custody action, the trial court must consider all relevant factors outlined in R.C. 2151.414(D), including, the wishes of the child. "However, R.C. 2151.414(D)(1)(b) specifically provides that consideration of the wishes of the child may be 'as expressed directly by the child *or* through the child's guardian ad litem[.]" (Emphasis sic.) *In re Z.W.*, 2025-Ohio-1410, ¶ 35 (3d Dist.), quoting R.C. 2151.414(D)(1)(b). "Thus, 'a juvenile court has the option of either having the child assert his or her opinion, through, for example, an in-camera interview or testimony, or the court may rely upon the guardian ad litem's representations with respect to the child's desires.'" *Id.*, quoting *In re Funk*, 2022-Ohio-4953, ¶ 30 (11th Dist.). "'Because the juvenile court has a choice, the decision not to conduct an in-camera interview will be reversed only if the court abused its discretion in declining

to do so.'" *Id.*, quoting *Funk* at ¶ 30, citing *In re Whitaker*, 36 Ohio St.3d 213, 219 (1988). A trial court's decision whether to interview a child will not be reversed absent an abuse of discretion. *Funk* at ¶ 30, citing *Whitaker* at 219.

{¶50} On August 20, 2024, Alicia filed motions for the trial court to conduct an in-camera interview of the children. On September 27, 2024, the trial court filed its judgment entries denying Alicia's motions for in-camera interviews on the basis that "there is nothing in the Ohio Revised Code or Juvenile Rules that compels the Court to do an In Camera [interview] before a Permanent Custody Hearing."

{¶51} In support of her contention that the trial court abused its discretion by denying her motions for in-camera interviews, Alicia alleges that the trial court did not ascertain the children's wishes because the guardian ad litem only expressed her opinion that it was in the children's best interest for the trial court to grant the Department's motion for permanent custody. However, the guardian ad litem's report was entered as an exhibit in the permanent-custody hearing. Throughout the report, the guardian ad litem noted the children's wishes as expressed throughout the pendency of the case.

{¶52} With respect to G.N., the guardian ad litem noted that, initially, he expressed a desire to be reunited with Alicia. As the case progressed, G.N. expressed that he also viewed the foster family as his family. In spring 2024, G.N. expressed that he would like to be with Alicia but that if it is in his best interest to stay with the foster family, then that is what he wants. However, he expressed

concern about Alicia finding out. But, in October 2024, G.N. told the guardian ad litem that he would like to stay with his foster parents long term.

{¶53} In regard to H.N., the guardian ad litem's report details that although at the beginning of the case, H.N. expressed some desires to be reunified with her mother, as time went on, H.N. became more conflicted on whether she wanted to go back to Alicia's home or stay with her foster family. H.N. shared more concerns about returning to Alicia's home. For instance, she was afraid that Alicia would not allow her to attend school or give her the support needed, such as making sure she has clean clothes that fit her properly. From the spring of 2024, H.N. began consistently telling the guardian ad litem that she would like to live with her foster family long term. In August 2024, H.N. began expressing to Alicia and Catlin that she did not want to go home.

{¶54} Finally, on October 21, 2024, the guardian ad litem reported that G.N., H.N. and the foster parents "are not interested in legal custody" and "want adoption."

{¶55} Accordingly, the guardian ad litem report included detailed accounts of the children's wishes regarding their placement. Thus, the report does not support Alicia's allegations that the trial court had "no way" "to discern the children's wishes." (Alicia's Appellant Brief at 9). Furthermore, although Alicia argues in her brief that "[t]he testimony regarding the children's wishes strongly suggest that

they were in line with hers," the weight of the evidence indicates that the children desired to stay with their foster family.

**{¶56}** Thus, after reviewing the record, we find that the trial court did not abuse its discretion by denying Alicia's motions for an in-camera interviews of the children. Accordingly, Alicia's second assignment of error is overruled.

### Alicia's Third Assignment of Error

**The trial court abused its discretion when it placed the children in shelter care and awarded temporary custody to the State immediately after they were taken from [Alicia].**

### Catlin's First Assignment of Error

**The trial court violated appellants' due process rights by failing to provide a fair adjudicatory hearing.**

### Catlin's Fifth Assignment of Error

**The trial court erred in denying Appellants' Motion to Dismiss for failure to establish dependency by clear and convincing evidence.**

**{¶57}** Alicia's third assignment of error and Catlin's first and fifth assignments of error challenge the proceedings at the shelter care hearing and adjudicatory hearing.

**{¶58}** In Alicia's third assignment of error, she argues that the trial court abused its discretion by placing the children in foster care and awarding temporary custody of the children to the State. Specifically, Alicia argues that at the time of her arrest around midnight on September 29, 2024, she immediately informed

Catlin, who was living in Michigan, of her arrest. According to Alicia, Catlin immediately began driving to Alicia's Coldwater, Ohio home to care for H.N. and G.N.

{¶59} Alicia challenges the trial court's finding at the shelter-care hearing that the trial court made reasonable efforts under the circumstances to prevent the removal of the children from the home. Alicia contends that it would not have been unreasonable for the officers at the scene to wait several hours for Catlin to arrive at her house to care for the children.

{¶60} In his first assignment of error, Catlin argues that his due-process rights, were violated, particularly during the adjudicatory phase of the case. He argues that the State's evidence at the adjudicatory hearing was insufficient for the trial court to continue the children in the temporary custody of the Department. Thus, Catlin reasons that the trial court erred by denying his and Alicia's motions to dismiss the case at the close of the adjudicatory phase.

{¶61} In his fifth assignment of error, Catlin challenges the trial court's adjudication of G.N. and H.N. as a dependent and neglected children. Specifically, Catlin alleges that because the dependency determination was not supported by clear and convincing evidence, the trial court should have granted the parents' motion to dismiss the case at the close of the adjudicatory phase.

{¶62} However, the time for making these arguments has long passed. "'An adjudication by a juvenile court that a child is "neglected" or "dependent" as defined

by R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a "final order" . . . and is appealable to the court of appeals[.]'" *In re H.F.*, 2008-Ohio-6810, ¶ 8, quoting *In re Murray*, 52 Ohio St.3d 155 (1990), syllabus. However, Catlin and Alicia failed to file any such appeal challenging the children's adjudication and initial disposition. "Res judicata bars litigation of '"a matter that was raised or could have been raised on direct appeal when a final, appealable order was issued in accordance with the law at the time."'" *In re B.F.*, 2021-Ohio-4251, ¶ 21 (3d Dist.), quoting *In re L.S.*, 2020-Ohio-5516, ¶ 20 (4th Dist.), quoting *State v. Griffin*, 2013-Ohio-5481, ¶ 3. Thus, because Catlin and Alicia could have raised their challenges to the trial court's findings on appeal from the children's adjudication and initial disposition, res judicata now precludes Alicia and Catlin from making these arguments. *See In re B.F.* at ¶ 21; *In re L.S.* at ¶ 31 (because Mother did not challenge the trial court's reasonable-efforts findings it is barred by res judicata "because the parents could have raised the issue in a direct appeal from the court's dispositional order"); *In re A.S.*, 2012-Ohio-3197, ¶ 53 (3d Dist.).

{¶63} Accordingly, Alicia's third assignment of error and Catlin's first and fifth assignments of error are barred by res judicata and are, therefore, overruled.

### Catlin's Second Assignment of Error

**The trial court erred in admitting and relying on unreliable and prejudicial drug test evidence.**

{¶64} In his second assignment of error, Catlin argues that the trial court erred by admitting and considering testimony and evidence relating to the drug tests. Although his argument lacks specificity, we can glean that Catlin attempts to challenge the admissibility of several of the Department's exhibits, specifically, two certified packets of drug screen results relating to Alicia (JFS Exhibit 13, JFS Exhibit 14), a certified packet of laboratory results relating to Catlin (JFS Exhibit 15), and single certified result for Catlin that occurred in October 2024 (JFS Exhibit 16) as well as the testimony of Jerome Reed ("Reed"), a certified scientist at Forensic Fluids laboratory who testified regarding the results of the drug screens given to Alicia and Catlin.

{¶65} To the extent that Catlin is attempting to argue that the trial court erred by admitting JFS Exhibits 13 through 16, we note that at the hearing, counsel did not object to the admission of the exhibits and noted that because the records were certified, they were admissible. Accordingly, Catlin is limited to plain error analysis on appeal. *State v. Fisher*, 2020-Ohio-6829, ¶ 7 (7th Dist.). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceedings, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

Under the plain error standard, the appellant must demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise. *State v. West*, 2022-Ohio-1556, ¶ 35-36. Here, Catlin summarily argues that the "admission of unreliable drug testing evidence prejudiced Appellants and influenced the outcome of the proceeding" and should therefore not have been admitted. (Catlin's Appellant Brief at 11). Accordingly, we do not find that Catlin has demonstrated that the trial court committed plain error by admitting the exhibits.

{¶66} Insofar as Catlin argues that the trial court erred by relying on Reed's testimony and the results of the drug screenings, we find that argument to be unavailing. At the permanent-custody hearing, Reed, a certified scientist at Forensic Fluids Laboratory testified to his extensive background in drug testing. Reed described the process and procedures the laboratory uses when processing samples. Reed detailed the process by which the technicians inspect samples upon arrival at the laboratory to confirm they have been properly sealed, have not been tampered with or damaged, and to ensure proper chain of custody.

{¶67} Reed then described the initial testing process, which tested for the various chemical compounds. According to Reed, if the initial screening returns a positive result, the sample is retested using liquid chromatography-mass spectrometry. If the spectrometer yields a positive result, the results are interpreted by certifying scientists.

{¶68} Reed detailed some of the processes the laboratory utilizes to ensure the accuracy of their results, such as proficiency testing. Reed testified that the mass spectrometer allows the laboratory to avoid false positives by allowing them to observe "the deep molecular fingerprint" of the drugs, which are akin to human finger prints, "no two look the same."

{¶69} According to Reed, the samples the lab received relating to Alicia and Catlin were processed in accordance with the procedure Reed described. Reed then interpreted the results of the multiple drug screens the lab processed for Alicia and Catlin. Most notably, Alicia tested positive for methamphetamine and amphetamine 15 times, and Catlin tested positive for methamphetamine and amphetamine two times. Reed explained that once methamphetamine enters the blood stream, the liver filters the blood and, in the process, converts the methamphetamine to amphetamine and amphetamine is therefore a metabolite of methamphetamine. Accordingly, when there is a positive result for methamphetamine, there will also be a positive result for amphetamine. However, the reverse is not true, and there is not a substance that could break down and turn into methamphetamine.

{¶70} Reed testified that if a person was taking Adderall, it would show up on the drug screen as amphetamine. However, it would not be possible for Adderall to show as a positive for methamphetamine on a drug screen. Reed also described the limitations on the sensitivity of the saliva drug screens the laboratory processed. Specifically, he testified that the amount of the drug present in the oral fluids are

"pretty small." As a result, if someone was taking a drug the day before the saliva screen, the drug may not be detectable in their blood. Accordingly, even if someone was taking a prescribed drug which should, theoretically, yield a positive result on the drug screen, if the individual was not taking the drug as prescribed, the drug screen may not yield a positive result even if the person had indeed recently used the drug.

{¶71} Catlin contends that the trial court erred by considering the evidence and testimony relating to the drug screens because he alleges that it is not reliable or credible. In support, he argues that because Alicia testified that she was taking a number of prescription drugs that should have yielded positive results on the drug screens, but did not, that the drug screen evidence was unreliable. Specifically, Catlin challenges the positive screens for methamphetamine. He reasons that because the drug screens did not detect some prescription medications that Alicia testified she was taking regularly, the positive drug screens for methamphetamine must have been in error. He further alleges that because those drug screens were allegedly made in error, the results of all of the drug screens were unreliable. Accordingly, he argues that the trial court erred by relying on the results of the drug screens when determining the best interest of the children.

{¶72} We are not persuaded. First, we note that Catlin's argument is not consistent with the evidence. Reed testified that the saliva drug screens that the laboratory processed were somewhat limited in their ability to detect the presence

of drugs because the concentration of drugs in the saliva is quite low. Accordingly, Reed stated that even if someone was using a particular drug, the level of that drug on the screen would potentially be too low to detect. Reed did testify that if someone was taking a particular drug consistently, as prescribed, it would show up on a screen. Yet, a missed dose could result in a drug screen coming back negative despite the individual taking the drug.

{¶73} Furthermore, Catlin seems to be arguing that the drug screens included false positive screens. However, Reed testified to the processes the laboratory employs to safeguard against false positives. Specifically, Reed stated that the type of equipment the lab uses and the type of testing it employs does not allow for false positive results. No party presented any evidence to contradict Reed's testimony relating to the unlikelihood of false positive results. "We are mindful that the juvenile court, as the trier of fact, was in the best position to weigh the evidence and evaluate testimony so every reasonable presumption must be in favor of the judgment and the finding of facts." *In re T.J.*, 2024-Ohio-110, ¶ 13 (6th Dist.). Accordingly, we do not find that the trial court erred by relying on the testimony of Reed and the laboratory test results indicating that the parents tested positive for certain drugs.

{¶74} Furthermore, testimony regarding the sensitivity of the tests and the limitations that the tests may have, were part of the weight of the evidence, and we do not find the trial court erred by finding the evidence adduced at trial supported a

finding that Alicia and Catlin used illicit drugs at various times throughout the pendency of the case.

**{¶75}** Catlin's second assignment of error is overruled.

### Catlin's Third Assignment of Error

**The trial court improperly admitted hearsay evidence in violation of the Ohio Rules of Evidence.**

**{¶76}** In his third assignment of error, Catlin argues that the trial court erred by improperly admitting hearsay evidence in violation of the Rules of Evidence.

**{¶77}** "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). *See HSBC Bank U.S.A., Natl. Assn. v. Gill*, 2019-Ohio-2814, ¶ 6-10 (1st Dist). However, if Catlin failed to object to the admission of the alleged hearsay by which he now complains, it is reviewed for plain error. *State v. Obermiller*, 2016-Ohio-1594, ¶ 72.

**{¶78}** Here, Catlin summarily argues that "[t]estimony from agency workers frequently included references to statements allegedly made by third parties, including foster parents, relatives, and unidentified community members." (Catlin's Appellate Brief at 12). Catlin alleges that these "included statements suggesting parental unfitness, describing the children's emotional state, or making claims about past drug use or behaviors." Catlin also asserts without elaboration that the trial court erred by permitting the introduction or written reports and summaries from

third-party sources, including the guardian ad litem and caseworkers which contained embedded hearsay statements.

**{¶79}** Through his brief and ambiguous argument, Catlin invites this court to comb through the record of the permanent-custody hearing, which spanned two full days, to identify potential hearsay statements. "'[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal.'" *State v. Costell*, 2016-Ohio-3386, ¶ 86 (3d Dist.), quoting *State v. Stelzer*, 2006-Ohio-6912, ¶ 7 (9th Dist.). If an argument exists that can support an assignment of error, it is not this court's duty to root it out. *State v. Shanklin*, 2014-Ohio-5624, ¶ 31 (3d Dist.).

**{¶80}** "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 2015-Ohio-3322, ¶ 11 (10th Dist.), quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Id.*, quoting App.R. 16(A)(7). Here, not only did Catlin fail to include an argument specifying which statements and exhibits were alleged

hearsay, he also failed to provide citations to the parts of the record support his argument. Thus, we need not address Catlin's argument that the trial court improperly admitted hearsay.

{¶81} Consequently, Catlin's third assignment of error is overruled.

**Catlin's Fourth Assignment of Error**

**The trial court failed to adequately consider and weigh alternative placements for the children.**

{¶82} In his fourth assignment of error, Catlin argues that the trial court failed to adequately consider kinship placements for the children. According to Catlin, although he and Alicia identified potential individuals who could care for the children, the trial court did not adequately explain why those alternative placements were rejected. Catlin reasons that "[r]ather than weighing those placements under the best interest factors or citing any legal disqualifications, the court defaulted to the Department's preference for state custody without exploring the statutory preference for kinship placements." (Catlin's Appellate Brief at 14).

{¶83} However, Catlin's argument lacks the specificity to allow us to conduct a meaningful review. At the time of the permanent-custody hearing, the only potential kinship placement that expressed an interest and ability to care for the children was Yoder, the children's adult half-brother. However, according to Yoder's testimony and the testimony of Department representatives, he was not identified as a potential placement for H.N. and G.N. until August 2024 when he

reached out a caseworker to express his interest in being considered as a placement for his younger half-siblings. Yoder did not make his desires known until August 24, 2024 and the caseworker responded on August 30, 2024 asking Yoder to provide his address, his employment, his work hours, and the criminal records for himself and any members of his household. However, Yoder admitted that he did not provide the information to the caseworker until October 16, 2024, approximately two weeks prior to the commencement of the permanent-custody hearing. The caseworker testified that, in the event the trial court did not grant the Department's motion for permanent custody, Yoder was still being considered as a kinship placement. However, due to how late in the case Yoder was identified as a possible placement, Yoder's delay in providing the caseworker with the requested information, and the lengthy process of vetting an out-of-state individual for potential placement, his application was still pending.

{¶84} Two of Alicia's sisters were also discussed at the permanent-custody hearing as possible kinship placements at various times during the pendency of the case. One of the caseworkers testified that Alicia's sister, Tiffany, had expressed an interest in becoming a kinship placement for the children. Early on in the case, H.N. and G.N. enjoyed an extended weekend with Tiffany and her family and, very shortly after that visit, Tiffany contacted the caseworker to inform her that she no longer wished to be considered as a placement for the children. Avery Etereka,

Alicia's other sister, testified that she is not a candidate for placement of the children because she lives in a 700-square-foot one-bedroom home.

{¶85} Given the totality of the circumstances and the lack of specificity of the brief argument outlined in Catlin's assignment of error, we do not identify reversible error in the trial court's consideration of possible kinship placements.

{¶86} Catlin's fourth assignment of error is overruled.

*Conclusion*

{¶87} Having found no error prejudicial to Alicia and Catlin herein in the particulars assigned and argued, we overrule the assignments of error and affirm the judgments of the Mercer County Court of Common Pleas, Juvenile Division.

***Judgments Affirmed***

**WALDICK, P.J. and WILLAMOWSKI, J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the appeals filed by Acobie Yoder are dismissed. Furthermore, the assignments of error filed by Alicia N. and Catlin N. are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

 

Mark C. Miller, Judge

 

Juergen A. Waldick, Judge

 

John R. Willamowski, Judge

DATED:
/jlm