[Cite as *In re K.W.*, 2026-Ohio-707.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

IN RE:

    K.W.,

ADJUDICATED NEGLECTED CHILD.

[DARIN W. - APPELLANT]
[LAURA H. - APPELLANT]

**CASE NO. 3-25-18**

**OPINION AND
JUDGMENT ENTRY**

---

IN RE:

    H.W.,

ADJUDICATED NEGLECTED CHILD.

[DARIN W. - APPELLANT]
[LAURA H. - APPELLANT]

**CASE NO. 3-25-19**

**OPINION AND
JUDGMENT ENTRY**

---

IN RE:

    M.W.,

ADJUDICATED NEGLECTED CHILD.

[DARIN W. - APPELLANT]
[LAURA H. - APPELLANT]

**CASE NO. 3-25-20**

**OPINION AND
JUDGMENT ENTRY**

---

Appeals from Crawford County Common Pleas Court
Juvenile Division
Trial Court Nos. C 2245048, C 2245052, and C 2245053

**Judgments Affirmed**

**Date of Decision:  March 2, 2026**

Case Nos. 3-25-18, 19, 20

---

**APPEARANCES:**

*Eric H. Griebling* **for Appellants**

*Michael J. Wiener* **for Appellee**

**ZIMMERMAN, J.**

{¶1} Father-appellant, Darin W. ("Darin"), and mother-appellant, Laura H.-W. ("Laura"), appeal the July 1, 2025 judgment entries of the Crawford County Court of Common Pleas, Juvenile Division, ordering three of their children to the permanent custody of the Crawford County Job and Family Services (the "agency"). For the reasons that follow, we affirm.

{¶2} Darin and Laura are the biological parents of E.W. (born 2007), M.W. (born 2010), H.W. (born 2015), and K.W. (born 2018).[1] On May 17, 2024, the children were removed from the home. On May 21, 2024, the agency filed complaints alleging that E.W., M.W., H.W., and K.W. were neglected children pursuant to R.C. 2151.03(A)(2) due to "deplorable home conditions" and requested temporary custody of the children. That same day, the trial court appointed a guardian ad litem ("GAL") to represent the children.

---

[1] The oldest child, E.W., is not part of this appeal. At the final hearing held on May 21, 2025, Darin and Laura stipulated to a planned permanent living arrangement for E.W.

{¶3} On June 12, 2024, a hearing was held in the trial court wherein Darin and Laura admitted to the neglect allegations contained in the complaints. Additionally, the agency presented the testimony of the caseworker who investigated the home following a complaint made to the agency. The caseworker testified that she was invited into the home through an entryway having "only a small path" and "a large amount of things stacked next to it." (June 12, 2024 Tr. at 6). Inside the home, the caseworker observed a kitchen with "dirty dishes, old food, rotting food in the fridge." (*Id.*). The floor of the living room was covered with "trash . . . junk, things like that." (*Id.*). The bathroom "had cleanliness issues" and "a lot of staining and mold and filth." (*Id.*). The home had three bedrooms. The first bedroom, being the master bedroom, contained a crib and a toddler bed. The caseworker was informed that the youngest child, K.W. (age five), slept in the crib and H.W. (age eight) slept in the toddler bed. The second bedroom "was completely filled with items" and could not be entered. (*Id.*). The third bedroom belonged to the oldest child, E.W. (age 16). The bedroom was "filled with excessive amounts of junk" with "only a small pathway to [E.W.'s] bed." (*Id.*). The caseworker took photos of the home to document the unsafe conditions. When no family member could be found to do a safety plan for the children, Darin and Laura signed a voluntary agreement for care with the agency and the children were placed in foster care.

{¶4} Based on the parents' admissions, the caseworker's testimony, and the photos admitted into evidence, the trial court adjudicated the children to be neglected and proceeded to disposition. The trial court was advised that Darin and Laura participated in the preparation of the case plan. The GAL stated that he considered the case plan appropriate and in the best interests of the children.

{¶5} On July 1, 2024 the trial court entered judgments placing the children in the temporary custody of the agency and allowing Darin and Laura reasonable supervised visitation. The trial court also approved the case plan. Among the goals and objectives set forth in the case plan, the case plan provided that Darin and Laura "will obtain and maintain a clean, hazard free home for a minimum of six months" and "obtain age-appropriate bedding arrangements for the children." The case plan further provided that Darin and Laura "will cooperate and complete a mental health assessment through an agency approved provider" and "follow any recommendations of the mental health assessment."

{¶6} On November 21, 2024, the agency filed its semiannual review stating that Darin and Laura have made "insufficient progress on all case plan concerns." The semiannual review reported as follows:

> The home is not brought to safe standards. There are medical issues of the parents that will prevent them from having the energy to parent and meet the needs of the children. The parents do not demonstrate that they have realistic views of health issues of the children nor the ability to meet those needs. Counseling progress is insufficient.

{¶7} On January 15, 2025, the agency requested an extension of temporary custody set to expire on May 21, 2025. The trial court held a hearing on March 20, 2025 to address the agency's request. At the hearing, the agency expressed concern about the ongoing unsafe conditions of the home and that the caseworker had been denied access to parts of the home. Darin and Laura explained that they "sealed off" and do not use the master bedroom and bathroom because of mold issues. (Mar. 20, 2024 Tr. at 3). Despite the "unusable" condition of the master bedroom and bathroom, Darin represented to the trial court that "significant progress" had been made in the rest of the home. (*Id.* at 6). At the request of the parties, the trial court conducted a site review of the home. During the site review, the agency took photos to document the then-existing home conditions. Following the site review, the agency withdrew its request to extend temporary custody. Based on the unsafe home conditions, the agency planned to seek permanent custody of the children. The GAL advised the trial court that "looking at the place as it stands right now, I do not see a lot of visible improvement." (*Id.* at 12). The GAL supported the agency's decision to seek permanent custody of M.W., H.W., and K.W.[2]

{¶8} On April 14, 2025, the agency filed motions for permanent custody of M.W., H.W., and K.W., alleging that the children cannot or should not be placed with either parent within a reasonable time. The permanent-custody motions further

---

[2] The GAL supported a planned permanent living arrangement for the oldest child, E.W.

allege that "the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren]'s home."

**{¶9}** On May 9, 2025, the agency filed its second semiannual review. The second semiannual review reported that "[t]here has been insufficient progress with the home, as the home continues to have trash such as paper, cardboard, dead plants, dirt, food, spoiled food/out of date, mold, ants and insects/flies, water damage, odors, piles of clothing, storage bins, piles of debris, hoarded foods and items, etc." With respect to Darin and Laura's ability to parent the children, the second semiannual report stated:

> Darin [and] Laura completed parenting classes at Affinity but have failed to demonstrate what they've learned; they also have failed to address 1) hoarding specific behaviors, 2) treating [K.W.] at a younger age like a toddler/infant, 3) that they have significantly addressed their issues with failing to meet the dental, vision, and medical needs of the children. Laura and Darin previously failed to follow through with the assessments and services for speech and development for [K.W.]. Laura and Darin defend their shortcomings as being due to health issues but they do not have adequate resources to overcome these persisting/long term health barriers to their parenting, resource management, income, stability, and deplorable home conditions.

As to their mental health progress, the second semiannual review reported:

> Darin and Laura completed their assessment at Affinity on 09/09/2024. The assessment noted hoarding behaviors with the recommendation of having an experienced professional come into the home to help with hoarding. Follow up with Affinity occurred regarding the recommendation and if they had leads for referrals but they weren't aware of anyone that would go into the home to assist the family. During [the caseworker's] last visit to the home with

Darin and Laura on 04/24/25, [the caseworker] provided a list of providers for Hoarding Therapy that offered virtual visits to Darin, however he seemed confused about why they would need hoarding therapy with what they had already gotten rid of in the home. There is still an underlying issue for Laura and Darin in regards to hoarding behaviors that would make it beneficial for them to seek hoarding specific therapy.

{¶10} On May 19, 2025, counsel for Darin and Laura filed a motion requesting a 30-day continuance of the final hearing set for May 21, 2025. Specifically, the motion stated that the two older children, E.W. and M.W., were unavailable to attend the final hearing due to school schedules. "A thirty day continuance would mean that both [E.W.], age 17, and [M.W.], age 14, would be available for testimony as to their wishes, desires, and perceptions regarding the factors relevant to the best interest of all the children involved in the cases." The trial court denied the motion for continuance, noting that "no party has requested an in-camera interview of the children." (May 19, 2025 Judgment Entry).

{¶11} On May 21, 2025, the GAL filed his report recommending that permanent custody of M.W., H.W., and K.W. be granted to the agency. The GAL conducted an in-person interview of the oldest child, E.W., on May 9, 2025 wherein E.W. requested that she be permitted to continue to visit with her siblings. E.W. did not object to the planned permanent living arrangement, nor did she disagree with the GAL's recommendation.

{¶12} The GAL also conducted an in-person interview of K.W. on May 9, 2025. The GAL found K.W. to be a happy six-year-old boy who did not appear to

understand why he is with a caregiver and not his parents. K.W. talked about his current residence, his school, and life in general and offered no complaints. Due to K.W.'s young age, the GAL did not discuss the GAL's recommendations concerning permanent custody.

{¶13} The GAL was not able to interview M.W. and H.W. "Even without a conference, the condition of the home prevents the return of the minor children within a reasonable time." (May 21, 2025 GAL Report). The GAL's report explained as follows:

> Parents had done little to make the conditions better. Father continues to provide excuses that he will get to the condition in the future. During the last [semiannual review], Father blamed Mother's mental condition and said that he was too busy with his work and providing services for his children to improve his home. He further stated that he could not perform the necessary repairs due to his physical condition. He stated that he could only work for an hour and would then have to rest for an hour. He further stated that he had members of his Church that could help provide additional services in the future.
>
> During the initial removal of the children, the conditions of the house reflected little care of the property. The [caseworker] complained about unsanitary conditions, dirt and noxious smells within the home. Father states that after the children left, he had a roof failure over the master bedroom and bathroom that "destroyed" the master bath. Father had a year to improve those conditions. Instead, after a year, he had not removed the damaged bathroom walls, he had not removed the bedroom bedclothes, clothing and incidentals and had only tried (unsuccessfully) to patch the roof and block off the entire master suite by plastic. He even complained about the black mold throughout the bathroom and bedroom. The Parents had slept in the children's bedroom or the living room couch, since their bedroom was "unavailable". Father talked about how he intended to temporarily fix the roof with metal sheets but couldn't since he hurt his back. The furnace that was inoperable would also be fixed in the future. He did

not discuss how he would deal with the black mold spores throughout the house or remove them from the house and property. The house remained dirty and continued to exhibit noxious smells. The house remained in an unsanitary condition.

Father clearly had over a year to solve the situation. He has failed to be able to provide an appropriate home for his minor children. Mother has failed to demonstrate that she is able to be a caregiver. The child, K.W., was provided by Parent with additional clothes that were 2[T] sized. He was also provided with some old stuff[ed] toys that were dirty and possibly contaminated by the house's situation. I assumed that the clothes and toys were provided by Mother. If correct, she clearly is unaware of the child's true size or needs. During the [semiannual review], Mother did not seem as engaged with the discussion during the entire review. She tended to look away from the speakers and not participate unless her husband did.

(*Id.*).

**{¶14}** A final hearing on the permanent-custody motions was held on May 21, 2025. Testimonial and documentary evidence presented at the hearing established that Darin and Laura failed to meet the goals and objectives of the case plan. After both parties rested, the trial court stated:

Well, I'm going to tell you this, usually I don't speak from the bench right away on these issues, but I find that if my children were removed from my house a year ago, I would have done everything I could have to do within a week or two to get the children back. Mom and Dad, you waited till just a few days ago to do the stuff to get the house habitable. I cannot [ ] return your children to this house based on the testimony that's been provided. I would be considering - - I would consider that action to be irreprehensible on my part. I have a duty to protect children. So I'm going to grant the motion[s] for permanent custody.

(May 21, 2025 Tr. at 70-71). Following the trial court's ruling from the bench, counsel for Darin and Laura requested that the court conduct in-camera interviews

-9-

of the two older children, E.W. and M.W., "to find out what their ideas are about custody of all four of the children." (*Id.* at 76). The GAL and counsel for the agency objected to interviewing the children based, in part, on the current home conditions and stipulated that M.W. would state that he wished to be returned to the home. In considering the matter, the trial court noted that, even if the children were to state that they wanted to go home, "I can't do that based on what I have seen here." (*Id.* at 79). "I can't find it's in the best interest of the children no matter what they say . . . [a]nd I just don't want to really put the children through this if we don't have to." (*Id.*). The trial court denied the request for in-camera interviews.

{¶15} On July 1, 2025, the trial court issued judgment entries granting the agency's motions for permanent custody of M.W., H.W., and K.W. The trial court found that the agency established by clear and convincing evidence that M.W., H.W., and K.W. cannot be safely placed in the care of either parent within a reasonable amount of time or should not be placed with either parent. The trial court further found that the evidence clearly and convincingly demonstrated that granting permanent custody of M.W., H.W., and K.W. to the agency is in the children's best interest.

{¶16} On July 30, 2025, Darin and Laura filed notices of appeal, raising two assignments of error for our review.

**First Assignment of Error**

**Where the parents of three children established at the hearing on [the agency's] Motion[s] for Permanent Custody that they had substantially remediated and significantly improved the condition of the home, which home condition was the predominant reason given by [the agency] for removing the children, it is reversible error for the trial court to ignore or disregard this evidence and to conclude the conditions of the home still presented a danger to the children at the time of hearing [the agency's] Motion[s] for Permanent Custody.**

{¶17} In their first assignment of error, Darin and Laura argue that the trial court erred by granting the agency permanent custody of their children because they presented evidence at the final hearing that the home conditions had improved.

*Standard of Review*

{¶18} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The rights and interests of a natural parent, however, are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

{¶19} When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. In particular, R.C. 2151.414 establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. First, the trial court

must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies. Second, the trial court must find that permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D). *In re K.S.*, 2021-Ohio-3786, ¶ 11 (3d Dist.).

{¶20} As to the first part of the permanent-custody test, R.C. 2151.414(B)(1) provides, in relevant part, that a trial court

> may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and *the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.*

(Emphasis added.) R.C. 2151.414(B)(1)(a). When R.C. 2151.414(B)(1)(a) is applicable, the trial court must determine if one or more of the factors set forth in R.C. 2151.414(E) exist as to each of the child's parents. If one or more of the factors exist, then the trial court must enter a finding that the child cannot be placed with either parent within a reasonable period of time or should not be placed with either

-12-

parent. *In re R.R.*, 2021-Ohio-1620, ¶ 66 (3d Dist.). In pertinent part, R.C. 2151.414(E) states,

> In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
>
>      . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the

-13-

child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

**{¶21}** "If the trial court determines that *any* provision enumerated in R.C. 2151.414(B)(1) applies, the trial court must determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest." (Emphasis in original.) *In re A.F.*, 2012-Ohio-1137, ¶ 55 (3d Dist.). Thus, the second part of the permanent-custody test mandates that the trial court consider the following factors to determine the best interests of the child:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e). Under the second part of the permanent-custody test, "the trial court considers the totality of the circumstances when making its best interest determinations. No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, ¶ 16 (3d Dist.).

{¶22} If the trial court makes these statutorily required determinations, a reviewing court will not reverse a trial court's decision unless it is not supported by clear and convincing evidence. *In re A.E.*, 2014-Ohio-4540, ¶ 28 (3d Dist.) ("A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established.").

{¶23} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

*Analysis*

**{¶24}** In this case, the trial court determined that M.W., H.W., and K.W. cannot be placed with either parent within a reasonable period of time or should not be placed with either parent under R.C. 2151.414(B)(1)(a). The trial court made this determination after considering the factors set forth in R.C. 2151.414(E) and finding that the following exists as to Darin and Laura:

> [F]ollowing the placement of [M.W., H.W., and K.W.] outside [their] home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child[ren] to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the [children] to be placed outside the child[ren]'s home[.] [T]he parents ha[ve] demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with the child[ren] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[ren][.] [T]he parents suffer from chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the such that is so severe that it makes the parent unable to provide an adequate permanent home for the child[ren] at the present time and, as anticipated, within one year after this hearing[.]

(July 1, 2025 Judgment Entries). *See* R.C. 2151.414(E)(1), (2), (4). Notably, the trial court found that "in the twelve (12) months this case has been open, the parents have failed continuously to remedy the conditions that resulted in their children's removal from the household when this case opened." (July 1, 2025 Judgment Entries). "[T]he parents are not capable of, or in a position to, make a sustained change, and there is no indication that this situation is likely to improve in the

foreseeable future." (*Id.*). The trial court further found that it is in the best interests of the children to grant the agency's motions for permanent custody.

{¶25} On appeal, Darin and Laura argue that "[t]he conditions of clutter and mold that existed at the beginning of the case had been effectively removed and remediated by the May 21, 2025 final hearing, so that the Court erred in granting [the agency's] motion[s] for permanent custody." (Appellants' Brief at 12). They contend that the evidence presented by the agency "was insufficient to permanently remove the three children, ages 14, 9, and 6 from the parents' custody." (Appellants' Reply Brief at 2). We disagree.

{¶26} The record demonstrates that the home conditions were deplorable when the children were removed from the home on May 19, 2024. At that time, both K.W. (age five) and H.W. (age eight) were sleeping in the master bedroom, with K.W. sleeping in a crib and H.W. sleeping in a toddler bed. M.W. (age 13) did not have a room to sleep in due to piles of trash being stored in his room. Among the goals and objectives set forth in the case plan, Darin and Laura needed to obtain and maintain a clean and hazard-free home for a minimum of six months, obtain age-appropriate bedding for the children, and complete a mental health assessment and follow any recommendations.

{¶27} The ongoing caseworker testified at the final hearing that her last visit to the home took place on May 19, 2025, and unsafe conditions remained. The caseworker observed "excessive . . . piles of items, dirt and grime on the floors, just

not satisfactory." (May 21, 2025 Tr. at 13-14). The caseworker further testified that, in addition to failing to obtain and maintain a clean, hazard-free home, Darin and Laura failed to follow the mental health recommendation of engaging in hoarding therapy.

{¶28} With respect to the best interests of M.W., H.W., and K.W., the caseworker testified that the children were doing well in foster care. The youngest child, K.W., "is thriving." (*Id.* at 15). "He is very well integrated into his foster family and he enjoys being there." (*Id.*). The caseworker testified that M.W. and H.W. "are also doing well." (*Id.*). M.W. is "thriving in school" and is "involved in a lot of extracurricular activities." (*Id.*). H.W. participated in a play.

{¶29} Darin testified at the final hearing regarding the efforts made to rectify the home conditions. Darin admitted that "there was a lot of trash" in the home when the children were removed. (May 21, 2025 Tr. at 39). Darin testified that he "cleaned out most of the big trash he[a]p." (*Id.*). Darin further testified that church members helped to replace a large portion of the roof and repair holes in the ceiling. The roof replacement and ceiling repairs were completed on May 17, 2025. As to mold remediation, Darin testified that he sprayed the walls with a mixture of bleach and water and painted with a mold-resistant paint. When asked if the mold remediation was effective, Darin replied "time is going to tell if we took care of the problem." (*Id.* at 41).

{¶30} Darin admitted that they do not have age-appropriate bedding for the children, nor did they engage in hoarding therapy as recommended. Darin testified that they were more concerned about "[g]etting the house cleaned up." (*Id.* at 49). Darin further admitted that the home does not have a working furnace. On cross-examination, Darin was asked if the home is "clean and appropriate at this time?" (*Id.* at 52). Darin responded, "I would say maybe 80, 80 percent. There's still - - I said there's piles of things that still - - there's some things that still need to be done." (*Id.*). After viewing the agency's photos depicting the home conditions as of May 19, 2025, Darin conceded that "there's still work to be done." (*Id.* at 54). He was pointedly asked, "So as it stands today you would acknowledge that your home is not in an appropriate condition for the children to be returned to?" (*Id.*). Darin replied, "Yes." (*Id.*).

{¶31} Laura testified that she is in agreement with Darin's testimony regarding the current condition of the home. Laura stated, "There really isn't much to elaborate besides getting the bedrooms set up and a few areas in the living room." (May 21, 2025 Tr. at 64). Laura further testified that she undergoes counseling at Affinity for depression and anxiety. Laura admitted that she does not take the antidepressant prescribed to her by a psychiatrist. Laura explained that, after speaking with a pharmacist, she decided not to take the antidepressant because "it could have interfered with one of my other medications." (*Id.* at 62).

{¶32} After reviewing the evidence in the record, we conclude that clear and convincing evidence supports the trial court's determinations under R.C. 2151.414 and the two-part test it was required to apply in granting the agency's permanent-custody motions as to M.W., H.W., and K.W. That is, clear and convincing evidence supports the finding that the children cannot be placed with either parent within a reasonable period of time or should not be placed with either parent, and that it was in children's best interest that the agency be granted permanent custody. Critically, the parents failed to remedy the conditions that caused the children to be removed from the home. The parents were unable to obtain and maintain a clean, hazard-free home for a minimum of six months. At the final hearing, Darin testified that the children should not be returned to the home in its current condition and Laura agreed with her husband's testimony. Consequently, the trial court did not err by granting permanent custody of M.W., H.W., and K.W. to the agency.

{¶33} Darin and Laura's first assignment of error is overruled.

**Second Assignment of Error**

**It is reversible error for the Court to refuse to conduct an in camera interview of the 14 year old son as to the reasons he wished to be returned to the home of his parents, where the son had probative information as to his own best interest and possessed sufficient maturity to express his own interest and that of his siblings regarding the permanent custody decision.**

-20-

{¶34} In their second assignment of error, Darin and Laura argue that the trial court abused its discretion by not conducting an in-camera interview of their 14-year-old son (M.W.) and their 17-year-old daughter (E.W.).

*Standard of Review*

{¶35} "A trial court's decision whether to interview a child will not be reversed absent an abuse of discretion." *In re G.N.*, 2025-Ohio-4999, ¶ 49 (3d Dist.). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Analysis*

{¶36} In this case, the trial court decided not to conduct an in-camera interview of E.W. and M.W. based on the parents' failure to remedy the conditions that caused the children to be removed from the home. The trial court noted that even if the children were to state that they wanted to go home, "I can't do that based on what I have seen here." (May 21, 2025 Tr. at 79). "I can't find it's in the best interest of the children no matter what they say . . . [a]nd I just don't want to really put the children through this if we don't have to." (*Id.*).

{¶37} Based on our review of the record, we conclude that the trial court did not abuse its discretion when it decided not to conduct an in-camera interview of the children.

{¶38} Darin and Laura's second assignment of error is overruled.

**{¶39}** Having found no error prejudicial in the particulars assigned and argued, we affirm the judgments of the trial court.

*Judgments Affirmed*

**MILLER and WALDICK, J.J., concur.**

Case Nos. 3-25-18, 19, 20

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered. The causes are hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
William R. Zimmerman, Judge


_____
Mark C. Miller, Judge


_____
Juergen A. Waldick, Judge

DATED:
/hls

-23-